AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Western District of Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:22mj12 |
| INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT NUMBER 100011572534966 IN THE POSSESSION OF FACEBOOK, INC. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1951 | Interference with Commerce by Force or Threats (Hobbs Act Robbery) |

The application is based on these facts:

See Attachment C.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

ATF Special Agent Peter Gonzalves

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: 1/27/22

*Judge's signature*

City and state: Abingdon, VA

Honorable Pamela Meade Sargent, USMJ

*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT NUMBER 100011572534966 IN THE POSSESSION OF FACEBOOK, INC.** | Case No. _____  <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Peter Gonzalves, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with Facebook user account number 100011572534966 (hereafter "the target account") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. (hereafter "Facebook"), an online social media provider headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information (including the content of communications) in its possession, pertaining to the subscriber or customer associated with the user account number 100011572534966.

1

2.      I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18 United States Code.

3.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since August 2016. I am currently assigned to the Bristol, Virginia Field Office. Prior to becoming an ATF Special Agent, I was a Special Agent with the U.S. Department of State, Diplomatic Security Service for approximately six years. I have taken part in numerous federal, state, and local investigations concerning document and identity fraud, financial fraud, cybercrimes, and firearms and narcotics violations.

4.      During my tenure in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds and the organization of drug conspiracies, and methods and techniques commonly employed during the commission of violent crimes, including robbery. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing confidential sources and cooperating witnesses; conducting physical surveillance; controlled buys; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen-register data; requesting,

collecting and analyzing billing records; and conducting court-authorized electronic surveillance. Further, I have participated in the preparation, presentation and execution of numerous search and arrest warrants which have resulted in the recovery of weapons, narcotics, money, and documentary evidence indicative of firearm and narcotic trafficking organizations. Additionally, I have assisted in investigations and arrests leading to convictions for violations of federal and state firearms and narcotics laws to include violent crime.

5.      Through instruction and participation in investigations, I have become familiar with the manner and methods by which narcotics traffickers and perpetrators of violent crimes conduct their illegal business and the language and terms that are used to disguise conversations about their illegal activities. From experience and training, I have learned, among other things, that in conversations narcotics traffickers and violent criminals believe susceptible to interception, they virtually never expressly refer to the illegal drugs or weapons or crimes by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs, drug quantities, crimes, and weapons using seemingly innocent terms. I am also aware that violent crime conspiracies are often hatched in advance of the event, and often involve electronic communications between coconspirators and others before and after the crime is perpetrated. These communications often show planning and post-crime

discussions.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1951 and 2, Interference with Commerce by Threats or Violence (Hobbs Act robbery) have been committed by Michael MILLER. There is also probable cause to search the information described in Attachment A for evidence of this crime, as described in Attachment B.

## PROBABLE CAUSE

8.     On May 9, 2021, at approximately 8:15 PM, an individual entered Bare's Discount Tobacco and Wine ("Bare's") located at 970 E. Main St. in Abingdon, Virginia, which is located in Washington County in the Western Judicial District of Virginia. According to the store clerk (hereafter known as "Victim 1") who was on duty at Bare's at the time, the individual produced a handgun and demanded access to the cash register and money safes. Victim 1 described the suspect as a tall and muscular white male, wearing a knit hat, a bandana covering his

4

face, blue jeans, and a green jacket. Victim 1 also reported the suspect placed a black handgun on the counter as he demanded cash. At approximately 8:23 PM, the suspect exited the store after taking approximately $35 in cash and two cartons of cigarettes without paying. Other than Victim 1 and the suspect, no additional individuals can be seen on security footage in the store during the time the suspect was inside the business.

9.     Bare's sells alcohol, tobacco, and packaged food products, many of which were manufactured and/or procured from sources outside the state of Virginia and therefore moved in interstate commerce.

10.    Investigators with the Abingdon, Virginia Police Department ("APD") later reviewed surveillance footage provided by Bare's and other businesses in the surrounding area. Surveillance footage shows that, at approximately 7:30 PM on May 9th (surveillance footage timestamp), a white Dodge Journey with an unknown license plate ("the suspect vehicle") drove around the exterior of Bare's and the adjacent businesses. Based on my training and experience, the suspect vehicle appears to be "casing," or surveilling the area in anticipation of committing a crime. At approximately 7:40 PM, the suspect vehicle appears to pull into a parking space at the Burger King located at 915 E. Main St. in Abingdon, Virginia. At approximately 8:05 PM, the suspect vehicle exited the Burger King parking lot.

11.     From approximately 8:07 PM through 8:12 PM, the suspect vehicle drove through parking lots of businesses between the BP station located at 906 E. Main St. in Abingdon, Virginia and Bare's. At approximately 8:14 PM[1], the suspect vehicle can be seen pulling into the BP gas station parking lot. An employee at the BP reported seeing a white Dodge Journey in the parking lot occupied by two individuals, and that one of the individuals exited the vehicle behind the BP station.

12.     At approximately 8:14 PM[2], an individual wearing similar clothing and matching the physical description of the suspect can be seen on surveillance footage walking from the rear of the BP parking lot in the direction of Bare's. At approximately 8:15 PM, the suspect entered Bare's and encountered Victim 1. At approximately 8:23 PM, the suspect exited the store and can be seen on surveillance footage walking from the area of Bare's toward the BP station.

13.     On or about May 11, 2021, a Washington County Sheriff's Office ("WCSO") investigator reported having a phone conversation with Michael MILLER after the robbery occurred. During this conversation, MILLER informed the investigator he was driving a white Dodge Journey belonging to "B.H." during the weekend. B.H. is an associate of MILLER's, though there is no evidence to date of B.H. participating in the conspiracy.

---

[1] This time was erroneously listed in previous affidavits as 8:20 PM. This affidavit has been updated to reflect the correct time.
[2] This time was erroneously listed in previous affidavits as 8:20 PM. This affidavit has been updated to reflect the correct time.

14.     On June 30, 2021, deputies with the WCSO arrested MILLER on outstanding state arrest warrants from other jurisdictions.  During a post-*Miranda* interview, MILLER stated he and Robert DAWSON were together in B.H.'s vehicle on the day of the robbery.  MILLER stated that while driving around, DAWSON asked MILLER to drop him off at the BP gas station.  MILLER later stated he and DAWSON discussed how easy it would be to rob Bare's, but MILLER indicated the conversation between him and DAWSON was meant in jest and that he did not actually intend to rob the store.  MILLER further stated this conversation took place at Bare's in the afternoon on the day of the robbery, and DAWSON and Victim 1 were both present.  MILLER also stated to investigators that Victim 1 is a "dear friend."  MILLER mentioned DAWSON goes by the nickname "Rupe," which is tattooed on DAWSON's hand.   During the interview, MILLER told law enforcement, "I swear, I think my buddy robbed her [the clerk at Bare's]."  When asked what buddy he was referring to, MILLER responded "Robert DAWSON."

15.     MILLER provided DAWSON's address as 7957 Dry Fork Road, North Tazewell, Virginia.  MILLER stated he had picked up and dropped off DAWSON at this address in the past.  MILLER reported that he had stayed the night at this address in the past, and that when he woke up in the morning Dawson was shooting a gun into the yard from the porch.  MILLER also said that there were multiple dogs at the house, including two pit bulls.

7

16.     Investigators reviewed records obtained from Google pursuant to a federal search warrant regarding an account attributed to MILLER.  These Google records contained detailed location information collected from a mobile device connected to that account.  Google records indicated the location of this device was recorded on several occasions at 7957 Dry Fork Road in North Tazewell, Virginia.

17.     On June 30, 2021, investigators interviewed Victim 1 regarding the robbery.  Victim 1 stated he/she observed a tall, muscular individual enter the store. After picking up a drink from the cooler, the individual approached the counter, demanded money from the register, and placed a small handgun on the counter. Victim 1 was unable to determine if it was a real firearm, but described it as small, black, and "old" looking.  Victim 1 stated that he/she debated with the individual for several minutes and did not want to open the register for the suspect.  Victim 1 stepped out from behind the counter, and the suspect attempted to open the cash register unsuccessfully.  The suspect then took approximately $35 in cash from an unlocked cashbox and two cartons of cigarettes, both of which were located behind the counter, before leaving the store.

18.     Victim 1 also admitted to having a relationship with MILLER.  Victim 1 stated that he/she was initially hesitant to disclose that fact as Victim 1 is presently married.  Victim 1 confirmed that, on the afternoon of the robbery, he/she had been at Bare's with MILLER and another individual with long hair.  Victim 1 further

8

stated that he/she was with MILLER at B.H.'s residence the day after the robbery. Victim 1 also stated the individual with long hair who was with MILLER and Victim 1 at Bare's on the afternoon of the robbery was also present at B.H.'s residence, and that the individual had a puppy with him.

19.     Based on MILLER's and Victim 1's statements, investigators concluded the second male present at B.H.'s residence on the day after the robbery was DAWSON. According to Victim 1, that evening Victim 1 overheard MILLER and DAWSON talking about the robbery. According to Victim 1, MILLER and DAWSON were upset about only getting $35 and two cartons of cigarettes. Victim 1 also stated that MILLER said he dropped DAWSON off and picked him up again after the robbery.

20.     Victim 1 also admitted that, after the fact, MILLER told him/her that MILLER and his friend with the long hair had planned and executed the robbery.

21.     On July 30, 2021, investigators interviewed Witness 1[3], who stated he/she stayed at the Red Roof Inn located at 887 Empire Dr. in Abingdon, Virginia for about 3 to 4 days around the time Bare's was robbed. Witness 1 stated that MILLER and another male who went by "Rupe" were in Witness 1's room at the Red Roof Inn on the day of the robbery. Witness 1 stated MILLER and Rupe arrived

---

[3] At the time of this interview, Witness 1 was incarcerated related to pending state drug charges unrelated to this matter. Witness 1 consented to the interview in the presence of defense counsel, and received consideration for state charges in return for cooperation in this investigation.

to his room in a "white van" belonging to an individual who lives in Damascus, VA. Based on Witness 1's description and facts gathered previously during the investigation, investigators concluded the owner of the "white van" is B.H. (referenced above). Witness 1 said that Rupe had a pit bull puppy with him. Witness 1 said that MILLER and Rupe came to his/her room in the late morning and asked to borrow money. Witness 1 explained that he/she and his/her significant other went out to dinner that night, that MILLER and Rupe were in the room when Witness 1 went out to dinner, that MILLER was in the room when Witness 1 came back from dinner, and that Rupe came back to the room sometime later. Witness 1 explained that when he/she returned from dinner, there was a large police presence at Bare's.

22.    Witness 1 stated he/she has known MILLER for about a year. He/she described Rupe as being about 24 to 25 years old with sandy-colored shoulder-length hair and being very muscular. Rupe also told Witness 1 he was from Tazewell County. According to Witness 1, MILLER met Rupe somewhere in the area of Richlands, which is in Tazewell County, Virginia. Based on Witness 1's description of Rupe and statements made by MILLER, investigators concluded Rupe is indeed Robert DAWSON.

23.    When asked about weapons, Witness 1 stated DAWSON showed him/her a small black pistol. Witness 1 also stated DAWSON wanted to sell that pistol for approximately $200. Witness 1 stated he/she saw DAWSON carry the

pistol in his back pocket. Witness 1 also stated he/she saw DAWSON give the pistol to MILLER at one point, but did not see MILLER return it to DAWSON. When asked to elaborate on the weapon Witness 1 saw DAWSON carrying, Witness 1 stated he/she saw DAWSON show the pistol to another person who stopped by to visit. According to Witness 1, DAWSON removed the magazine from the pistol and Witness 1 saw that there were rounds present in the magazine.

24.     According to Witness 1, at one point during the day DAWSON said he needed money to get back to Tazewell. DAWSON also stated he has committed robberies previously and was able to take a fair amount of cash. Witness 1 stated he/she heard MILLER and DAWSON talk about robbing Bare's believing they could get some money.

25.     Witness 1 stated MILLER left a green jacket in the back of the vehicle driven by Witness 1's significant other. MILLER later instructed Witness 1 to "get rid of" the jacket. Witness 1 also reported seeing MILLER wearing a green jacket the day of the robbery.

26.     According to Witness 1, MILLER told him that he visited Victim 1 at the store the day of and the day after the robbery. Witness 1 also stated MILLER said he and DAWSON both committed the robbery, and MILLER thought DAWSON set him up to "take the fall." Witness 1 also stated MILLER told him/her the proceeds from the robbery were a small amount of cash and some cigarettes.

27.    Witness 1 also remarked that MILLER had told him that the photo of the robber posted to Facebook by law enforcement was actually MILLER, though investigators have dismissed this statement as the surveillance footage of the robber does not resemble MILLER's size or stature.  According to criminal history reports that I have reviewed, DAWSON is a substantially larger person than MILLER.  In addition, based on my review of a recorded interview with MILLER and the video surveillance of the robbery, the individual who entered and robbed Bare's has a voice that does not sound like MILLER's voice.

28.    Investigators reviewed data provided by Google pursuant to a federal search warrant regarding an account attributed to MILLER.  These Google records contained detailed location information collected from a mobile device connected to that account.  The location information placed the device in the immediate vicinity of the Red Roof Inn located in Abingdon Virginia earlier in the day prior to the robbery.

29.    Based on my training and experience, I know individuals involved in violent crimes often communicate with coconspirators and associates regarding their activities during the planning stages, execution, and aftermath.  Perpetrators also often brag about their activities to others via social media.

30.    In this case, Victim 1 stated he/she occasionally communicated with MILLER via Facebook messenger.  According to Victim 1, their most recent

communication via Facebook was approximately 1 to 2 days prior to MILLER's arrest. Victim 1 stated during the June 30 interview that some of the messages were about Victim 1's appointment to be re-interviewed by law enforcement. These statements indicate MILLER and Victim 1 conversed about the robbery using Facebook Messenger, and additional information may be gained by reviewing the message content.

31.     During the interview with MILLER described in paragraph 14 above, MILLER told law enforcement that he had sent his mother a Facebook message regarding DAWSON's home address on Dry Fork Road so that his mother could pick him up from DAWSON's residence after the robbery. MILLER also stated that he messaged Victim 1 on the night of the robbery, though it is not clear from his statement if MILLER was referring to Facebook Messenger or some other means of messaging. However, MILLER also stated that Facebook Messenger is how he talks to "everybody."

32.     Investigators conducted a search of publicly accessible Facebook accounts for "Michael Miller" and "Mike Miller." A search by name revealed numerous accounts, however only the target account contained photographs of MILLER. While reviewing publicly visible information "posted" by the target account, investigators recognized the individual shown in the main profile picture as

MILLER.  The same individual (MILLER) also appears in numerous other publicly posted photographs.

33.    While reviewing publicly visible information posted to the target account, investigators noted numerous posts between May 9, 2021 and June 11, 2021.  This indicates the account was active and being used between the date of the robbery and MILLER's arrest.

## BACKGROUND CONCERNING FACEBOOK

34.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

35.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

14

36.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

37.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

38.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status"

updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

39.     Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

40.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on

the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

41.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

42.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

43.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

44.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

46.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

47.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

48.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with

Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

49.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses,

investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

50.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

51.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A),

and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

52.    Based on the forgoing, I request that the Court issue the proposed search warrant.

53.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

54.    This Court, the United States District Court for the Western District of Virginia, has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711 and 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).

## REQUEST FOR SEALING

55.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

_____
Special Agent Peter Gonzalves
Bureau of Alcohol, Tobacco, Firearms,
and Explosives
United States Department of Justice

Subscribed and sworn to before me on ~~telephonically~~ _January 27, 2022_.

_____
HONORABLE PAMELA MEADE SARGENT
UNITED STATES MAGISTRATE JUDGE

Reviewed by:  Whit Pierce, AUSA

23

## **ATTACHMENT A**

### **Property to be searched**

This warrant applies to information associated with Facebook user Michael Derek MILLER with Facebook user account number 100011572534966 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

### I.   Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

> (a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

> (b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

> (c)   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them to include "Facebook Live" videos;

(d)   All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)   All "check ins" and other location information;

(g)   All IP logs, including all records of the IP addresses that logged into the account;

(h)   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)   All information about the Facebook pages that the account is or was a "fan" of;

(j)   All past and present lists of friends created by the account;

(k)   All records of Facebook searches performed by the account;

(l)   All information about the user's access and use of Facebook Marketplace;

(m)   The types of service utilized by the user;

(n)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

II.   **Information to be seized by the government**

Upon receipt of the information from Facebook described in Section I of Attachment B, government authorized persons will review that information to locate the items described below.

All information described above in Section I that constitutes fruits, evidence,

or instrumentalities of violations of 18 U.S.C. §§ 1951 and 2 and involving Michael
Derek MILLER including, for each user ID identified on Attachment A, information
pertaining to the following matters:

(a) Communications (e.g. posts and messages (public and private),
friend requests etc.) between MILLER and any other potential
suspects/witnesses in this investigation.

(b) Evidence indicating how and when the Facebook account was
accessed or used, to determine the chronological and geographic
context of account access, use, and events relating to the crime under
investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as
it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID,
including records that help reveal the whereabouts of such person(s).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by

the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the

information contained in this certification is true and correct. I am employed by

Facebook, and my title is _____. I am qualified to

authenticate the records attached hereto because I am familiar with how the records

were created, managed, stored, and retrieved. I state that the records attached

hereto are true duplicates of the original records in the custody of Facebook. The

attached records consist of _____ **[GENERALLY DESCRIBE**

**RECORDS (pages/CDs/megabytes)].** I further state that:

     a.    all records attached to this certificate were made at or near the time of

the occurrence of the matter set forth by, or from information transmitted by, a

person with knowledge of those matters, they were kept in the ordinary course of

the regularly conducted business activity of Facebook, and they were made by

Facebook as a regular practice; and

     b.    such records were generated by Facebook's electronic process or

system that produces an accurate result, to wit:

          1.    the records were copied from electronic device(s), storage

medium(s), or file(s) in the custody of Facebook in a manner to ensure that they

are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____         _____

Date                                                          Signature